FILED
2007 Apr-30  PM 03:48
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DIVISION OF ALABAMA
SOUTHERN DIVISION

GUS. C. CORREA,                )
                               )
        Plaintiff,             )
                               )
v.                             )        Case No.  2:05-cv-2024-TMP
                               )
                               )
THE WATER WORKS AND            )
SEWER BOARD OF THE CITY        )
OF BIRMINGHAM,                 )
                               )
        Defendants.            )

## MEMORANDUM OPINION

This cause is before the court on the motion for summary judgment filed September 5, 2006, by the defendant, The Water Works and Sewer Board of the City of Birmingham, Alabama ("the Board"). Defendant seeks dismissal of all of plaintiff's claims. This matter has been fully briefed, and the court  has considered the evidence and arguments set forth by both parties. The parties have consented to the exercise of jurisdiction by the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

## II.  SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment

"always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." Id. at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. Celotex, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify

which facts are material and which are irrelevant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248.  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249.  His guide is the same standard necessary to direct a verdict:  "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983).  However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989).  Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff.  Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988).  Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor.  Anderson, 477 U.S. at 255.  The non-movant need not be given the benefit of every inference but only of every reasonable inference.  Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II. FACTS

For purposes of determining the defendant's motion for summary judgment, the following facts are undisputed or viewed in a light most favorably to the plaintiff and, therefore, are accepted as true:

The plaintiff, Gus C. Correa, is Hispanic,[1] although he was born in Chicago and is a natural-born citizen of the United States.  He was hired by the defendant Board on May 1, 1985, as a "B Mechanic."  Correa was supervised by William Shirley from 1992 until he was terminated on April 7, 2005.  Shirley promoted Correa to an "A Mechanic" on September 21, 1992, although such promotions are based primarily on seniority.  Since August 2003, Shirley and Shirley's subordinates were supervised by Sonny Jones, the general manager of engineering and maintenance (E&M Department).

During about 95 percent of the time that mechanics work at the Board, they work with another mechanic.  Usually, an "A mechanic" is paired with a "B mechanic."  During the last part of plaintiff's employment at the Board, a "B mechanic," Frank Gregory, was assigned to work with Correa.  Gregory and Correa traveled to work sites together in a Board-issued truck, but the relationship between them was tense.  According to Shirley, Correa had experienced problems getting along with co-workers as far back in time as 1994, and Shirley had received frequent complaints about Correa.[2]   Until 2004, however, Shirley never documented any problems in

---

[1]     Actually, plaintiff simply states that he "considered himself Hispanic," and that Jones knew that he considered himself to be Hispanic.  Defendant, however, does not dispute that the plaintiff is a member of a protected class.

[2]     Although plaintiff argues that none of his conduct prior to Gregory's complaint is relevant to his claims, he nevertheless repeatedly asserts that the Board should have sought the

Correa's evaluations, although he admits he would have documented them if they had been serious problems. Correa denies having any problems getting along with any of his co-workers. During a later investigation of a complaint made by Gregory in August 2004, however, several workers in the E&M Department said that they would not like to be paired with Correa, that he was difficult to work with, and that he was a "loner."

In 1997, Correa was accused of driving a Board-issued truck in an erratic manner on Highway 280. After the incident, Correa's wife and cousin had Correa involuntarily committed to Hillcrest Hospital for psychiatric treatment. He received in-patient care there, and was subsequently treated at Baptist Montclair Hospital, and finally on an out-patient basis in Texas, where he has a relative who is a doctor. After 12 weeks of leave, and after receiving approval from a psychiatrist, Correa returned to work for the Board. In 1998, Correa experienced more psychiatric problems, and the Board placed Correa on paid administrative leave until he received a physician's approval to return to work.

Correa continued to work for the Board without incident from 1998 until 2004, when he scheduled a vacation for March 4 through March 10, 2004. On March 11, 2004, Correa called Shirley and told him he was unable to come to work, and he remained off work until March 22, 2004. Shirley has testified that, at the time, he believed that Correa might have been seeking treatment for psychiatric ailments.

---

intervention of a psychiatrist and should have ascertained whether he was on the medication that a psychiatrist had previously prescribed for him because his supervisors were well aware of his past psychiatric problems. The court finds that Correa's history of mental instability is relevant to whether the Board believed that Correa was unable to function in the workplace, and is therefore relevant to the Board's arguments that relate to a lack of discriminatory intent and pretext.

At some point in early 2004, Jones had a conversation with Shirley in which they discussed their assessment that Correa was getting more difficult to get along with and that tension existed between Correa and his partner, Gregory. Jones and Shirley decided to talk with Correa about the issues. On April 8, 2004, Correa completed the self-review portion of his "Mid-Year Performance Review," in which he graded himself as "excellent" in all categories.

In May 2004, several co-employees filed complaints about Correa. In May 2004, Gregory wrote a letter to Shirley, complaining about Correa's conduct in playing music in the truck too loudly. Gregory described Correa as an "unstable person" whose mood changes quickly and has problems getting along with co-workers. He reported to Shirley that Correa "says several times a week that he does not trust anyone and he does not listen to anyone." On May 10, 2004, Jonathan Malloy complained that Correa and he had had a verbal disagreement. On May 24, 2004, Mike Skinner filed a complaint against Correa alleging that Correa was rude during a telephone conversation. Shirley overheard Correa's end of the phone conversation, and said Correa "acted inappropriately." On June 5, 2004, Shirley asked Correa to have his picture made for the Board directory. Correa refused, stating that he would have to see a memorandum stating that the picture was mandatory. Correa eventually had his picture made, although he didn't "think it was necessary."

On June 18, 2004, Jones met with Correa to discuss the problems he had getting along with co-workers. During that meeting, Jones asked Correa to improve his interpersonal relationships. On June 28, 2004, Shirley, plaintiff's direct supervisor, completed a portion of Correa's review, grading Correa as "below standard" in the conduct category, and writing that Correa "has a hard time with fellow employees." Correa also received three "above standard" ratings, and two "standard"

ratings in other categories.  During the meeting with Shirley, Correa refused to sit down and would

not respond when Shirley asked him to promise to get along with co-workers.  Shirley has stated that

getting along with co-workers is an essential job function, and that he received more complaints

about Correa in that area than about any other Board employee.  In connection with the mid-year

review, Correa complained about "attitudes" toward him, and said he felt they were discriminatorily

based on his race.[3]

On August 24, 2004, Gregory filed a second written complaint against Correa, alleging that,

while assisting Correa with backing the truck out of the shop, Correa almost backed the truck over

him.  Gregory reported that Correa laughed when he told Correa that he had almost hurt him.  He

also reported that Correa, that day and on others, began to accelerate away in the truck away while

Gregory was still climbing into the passenger seat, and that this constituted an unsafe working

condition.  The same day that Gregory filed the complaint, Jones met with Shirley about Gregory's

complaint. Jones decided to place Correa on paid administrative leave, effective August 27, 2004,

while he investigated the incident as one of workplace violence.  Correa denied that the incident ever

happened.

As part of the investigation, the Board's acting human resources manager, Melanie Murphy,

and Jones interviewed Gregory and seven other Board mechanics.  Gregory told them Correa had

---

[3]     Plaintiff describes these "attitudes" as "throwing cigarettes, filters, stealing tools,
[and] putting oil on the steering wheel," which appears to complain about actions of co-workers, not
supervisors.  Plaintiff claims that he also complained to Clark that he was abused as a Hispanic, but
the page of deposition to which plaintiff refers is not attached as an exhibit, and plaintiff's reference
to Jones' deposition does not address that issue.  However, plaintiff makes the vague assertion that
he was "treated differently" than other workers.

stated that he could "snap a man's neck like a twig." Correa denies making that statement, and Gregory has admitted that Correa never threatened him. Gregory said that Correa had once tried to tightrope-walk a wire at the Shades Mountain Filter Plant to get a dredge being worked on. Correa denies that the incident occurred. Several employees stated that they had seen Correa frequently accelerated before Gregory was in the truck, causing Gregory to have to try to climb into the passenger door while the truck was moving. A worker who had been assigned to work with Correa in the past stated that Correa did that routinely. On September 4, 2004, Gregory wrote another complaint stating he was afraid for his safety and his life and that he "cannot ride in the truck" with Correa. Gregory referred to Correa as a "very unstable man."

Ultimately, Jones did not find Correa had violated the policy against workplace violence.[4] Although no other employees corroborated Gregory's report that Correa almost backed the truck into him, several co-workers testified that Correa frequently accelerated before Gregory was in the truck. Based on this, Jones found that Correa had violated company safety policy.[5]

On September 24, 2004, Jones informed Correa by letter that the Board was considering taking "disciplinary action up to and including termination" based on the findings from the investigation. During the time Correa was on leave, the Board's human resources manager, Paul

---

[4]     The testimony of Jones is not as clear as plaintiff urges. While Jones does not claim that he made a finding that plaintiff violated the workplace violence policy, Jones clearly explained that he believed that Gregory's complaint should be viewed as a complaint of workplace violence, and that the only evidence he was able to obtain was that the event, if it occurred, was witnessed only by the plaintiff and the complainant, and that their versions of events were completely different.

[5]     Plaintiff argues that, according to Board policy regarding progressive discipline, such violations called for a written warning. The defendant asserts, however, that the discipline policy provides for immediate discharge in the case of "willful negligent or continued violations of safety rules." Jones' letter suspending Correa specifically cites Correa's "unsafe work habits."

Lloyd, suggested that Correa be referred to "a professional that could give us some assistance in this matter."[6]   Correa was then referred to Lita Clark, a licensed counselor who works for client companies through their employee assistance programs and is paid by the employers.   Lloyd recommended using Clark because he had referred several employees to her in his past job, and felt she might be able to address Correa's "workplace issues."   Lloyd told Clark that Correa had been treated for psychiatric disorders in the past and might be "off his medication."   Lloyd said that he wanted Clark to "help us decide if [Correa] could come back to work and practice safe work habits, not be a disruption to the department or a threat to other employees."

Jones referred Correa to Clark pursuant to an unwritten policy, used for the first time with Correa.   Jones ordered Correa to see Clark and to cooperate with her.   Correa saw Clark on two occasions.   The first visit was on October 27, 2004.   On that occasion, Correa refused to sign a HIPAA waiver or release which would have allowed Clark to review Correa's medical records.   Clark noted that Correa was not very compliant and refused to complete a HIPAA form.   Clark discussed the meeting with Lloyd later, and asserts that Correa gave her verbal permission to discuss the meeting with Lloyd.   When Clark asked Correa whether he was seeing any other doctor or

---

[6]     Plaintiff points out that Jones was aware of Correa's psychiatric problems, and that he thought Correa might be taking medication for a psychiatric disorder, and that the medication might need to be adjusted.   Shirley testified that he does not believe the problems would have occurred if Correa had stayed on his medication.   In the fall of 2004, Jones and Lloyd discussed Correa's medication.   Jones has stated that Correa acted paranoid, and Clark noted that Correa told her he felt threatened and was afraid someone was going to hurt him, which could be consistent with a diagnosis of psychosis.   Plaintiff seems to be faulting the employer for failing to properly assess his mental state and for failing to compel him to take medication, but the court fails to see any correlation between an alleged indifference to a mental illness and a showing of *racially* discriminatory intent.

psychiatrist, or whether he was taking any prescription medication, he responded that she did not need to know that.

Clark reported to Lloyd after her October meeting with Correa that she was "concerned about his anger." She recommended that he not be allowed to return to work at that time. She also noted that Correa insisted he had done nothing wrong, and blamed others for his problems at work.[7] On November 17, 2004, Jones sent Correa a "Proposed Disciplinary Action" informing Correa that the investigation had confirmed reports that Correa had violated the Board's "rules of courtesy and safety" and showed a "failure to follow supervisory instruction." The letter from Jones told Correa that Jones was recommending disciplinary action "up to and including termination," and gave Correa an opportunity to appeal the recommendation to the Board's General Manager, Michael Vann.

A hearing was held before General Manager Vann on January 3, 2005. Vann agreed that Correa was due to be disciplined, and gave Jones the responsibility for determining the method of discipline. Clark recommended, in a memo to Lloyd dated February 3, 2005, that Correa take an MMPI test to determine whether Correa had a mental illness. On March 3, 2005, Jones wrote a letter telling Correa that he was receiving a three-day suspension, but that he could return to work only after meeting with Clark on March 7, 2005. The return to work was contingent on Correa fully cooperating with Clark, signing a release for Clark, and taking the "written assessment" that Clark wanted to administer. Correa was told that his failure to cooperate with Clark could result in further

---

[7]     Defendant refers to page 45 of Clark's deposition, which has not been submitted as evidence. The statements relied upon by the court, however, are included on other pages of Clark's deposition or in her written report.

discipline, including termination, and that he would be allowed to return to work if returning was consistent with Clark's recommendations.  The decision to suspend Correa was made by Jones.

On March 7, 2005, Correa came for a second session with Clark.  He brought a tape recorder, asked Clark for permission to record the session, and did so upon her acquiescence.  Correa signed the release form as asked, and took the MMPI test.  The MMPI test was then delivered to another professional who interprets MMPI tests, Dr. Gerald Anderson.  The test was scored by computer on March 8, 2005.  On March 9, 2005, Clark sent a memo to Lloyd, indicating that Correa had been "unwilling to explore his part in why co-workers are refusing to work with him."  She further stated that the session was "nonproductive" and that Correa was more concerned with "defending himself" than improving his communication skills.  Clark also stated that Correa has taken the MMPI, and that she would provide the results when she received them.[8]  By memo dated March 8, 2005, Anderson reported that the MMPI test was deemed invalid and stated that the test results showed "high levels of naive defensiveness."  He stated Correa was "unwilling to admit to normal flaws and difficulties which most people own up to readily."  Anderson further reported that similar individuals "are often attempting to make a favorable impression."  The Board never sought further clarification of the test results, and Clark never recommended that Correa be terminated.

---

[8]     Plaintiff points out that Clark stated that Correa arrived for the session early, signed the release, and took the test, and notes that these observations are contrary to the memo she sent. Even so, it is undisputed that her report indicated that Correa had been uncooperative and unwilling to discuss why co-workers were refusing to work with him.  A transcript of the session with Clark, which plaintiff recorded himself, indicates that Correa was adamant in his insistence that he had done nothing wrong, that any complaints about his behavior were completely unfounded, and that he did not need to change his conduct in any way.

Lloyd reported to Jones what he had learned from Clark, and Jones then made the decision to terminate Correa.  Jones testified that he made the decision to fire Correa after he learned of Clark's report, because he had required Correa to "cooperate" with Clark, and "it was indicated that he was hostile and did not fully cooperate with her."[9]  Jones testified that he believed Correa had not been forthcoming on the test, and had answered with what he thought the Board might want to hear, rather than with truthful answers.  Jones informed Correa of the decision by letter dated April 7, 2005.[10]  Thereafter, Correa's position as an "A mechanic" was filled by Andy Pope, who is not Hispanic.

Based on these facts, plaintiff complains that the three-day suspension was an illegally biased discipline, and that his termination also was violative of Title VII in that it was based on his race and/or his earlier complaints of racial discrimination.  Correa asserts that no other employee was required to take an MMPI, and that he has been singled out for investigation and termination.  Lloyd has testified, however, that a white employee of the Board was required to see Clark in 2003 and was required to undergo a battery of psychological tests.  The white employee was required to receive

---

[9]    The plaintiff argues that Jones has testified that he did not consider other instances of complaints when making the decision to fire Correa, but that is not a fair reading of Jones' testimony.  Jones has stated that Correa's problems getting along with co-workers "formed the backdrop and background in helping me come to the decision that Gus had some interpersonal emotional problems."  (Jones Depo., p. 64).

[10]    Plaintiff's counsel makes much of the fact that "defendant's attorneys were involved every step of the way," noting that supervisors had discussed Correa's employment with Board attorneys, and that a lawyer was present at a meeting between Shirley and Jones just two days before Correa was placed on administrative leave.  The court finds no relevance to this fact.  The fact that an employer consults attorneys before, during, and/or after taking disciplinary action is as likely, if not more likely, to evidence an intent to adhere to the laws against discrimination as to evidence an intent to flout them.

12

psychiatric approval in order to return to work, and did so.  Plaintiff's counsel has submitted an affidavit stating that he represented that white employee referred to by the Board, and that at the time the referral to Clark, a lawsuit already had been filed and discovery exchanged.

### III. DISCUSSION

Defendant seeks summary adjudication of all of plaintiff's claims.  Defendant asserts that plaintiff has failed to prove a *prima facie* claim of racial discrimination or retaliation, and that, even if the *prima facie* showing were made, the plaintiff has failed to show that the stated, non-discriminatory reason for disciplining plaintiff was pretext, and that the real reason was violative of Title VII.

.

### A. Discrimination

Plaintiff alleges that he was given the three-day suspension and, later, terminated on the basis of his Hispanic race.    Title VII prohibits discrimination with respect to an employee's "compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).  Specifically, the statute provides that it shall be unlawful for an employer:

> to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a)(1).

A disparate treatment claim requires proof of discriminatory intent, either through the use of direct or circumstantial evidence. See, e.g., Equal Employment Opportunity Commission v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1286 (11th Cir. 2000). Direct evidence establishes that intent without the need for any inference or presumption. Id., quoting Standard v. A.B.E.L. Servs. Inc., 161 F.3d 1318, 1330 (11th Cir. 1998). Where there is no direct evidence, the plaintiff must prove intent through circumstantial evidence in accordance with McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Because there is no direct evidence of discriminatory intent in this case, plaintiff may prove a *prima facie* case of discrimination with circumstantial evidence by establishing that: (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he is qualified to do the job; and (4) his employer treated similarly situated employees who are not members of the protected class more favorably. See Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999). An alternative method of proving a *prima facie* case allows the plaintiff to prove as the fourth element that he was replaced by a person outside the protected class. Hammons v. Wallace State Comm. College, 174 Fed. Appx. 459 (11th Cir. 2006). Furthermore, it is not the duty of this court to evaluate whether the decision to terminate Correa was fair or wise; employers are free to make unfair or unwise employment decisions so long as they do not violate anti-discrimination statutes. See Elrod v. Sears, Roebuck and Co., 939 F.2d 1466, 1470 (11th Cir. 1991). Questionable business judgment is not evidence of discrimination. See id. Moreover, courts have recognized that the discrimination laws should not be used to override employment decisions "based on individual assessments of a person's abilities, capabilities, or potential." Magruder v. Selling Area Mktg. Inc., 439 F. Supp. 1155 (N.D. Ill. 1977).

14

Plaintiff has shown that he is a member of a protected class because of his race, and that he has suffered an adverse job action in that he was first suspended and then fired. It also is undisputed that plaintiff was replaced by a non-Hispanic.  Thus, three of the four elements of a *prima facie* case appear to be established without dispute.   It should be noted, however, that both plaintiff's suspension and termination appear to be disciplinary in nature, rather than the product of economic considerations.  For that reason, plaintiff also is required to show that a "nearly identical" employee, not a member of a protected group was treated more favorably than plaintiff.  See Burke-Fowler v. Orange County, Fla., 447 F.3d 1319, 1323 (11th Cir. 2006); Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999);  Ivey v. Paulson, ___ F.3d ___, 2007 WL 216284 (11th Cir. 2007).  Also as part of his *prima facie* showing, plaintiff must show that he was qualified for the job from which he was fired.

Turning first to the qualification element, Correa has repeatedly asserted that he was a good mechanic, with good knowledge of his job and good technical skills, an assertion with which his supervisors agree.  However, Shirley has testified that Correa had difficulty getting along with co-workers, and that getting along with co-workers is an essential requirement of the job.  Shirley has testified that he had more complaints about Correa than any other mechanic he supervised.  Correa asserts that none of the complaints against him was founded, and that all of the blame for any complaints lies with his co-workers. The Board's assessment of Correa's social skills may have been mistaken or unfair or just plain wrong, but their assessment rendered him unqualified for continued employment.  There is no evidence that the Board's assessment that Correa lacked the essential ability to work with his fellow employees was not truly believed by plaintiff's supervisors or the

Board.  And, as discussed *infra*, there is no evidence that the assessment was discriminatory.

Beyond the Board's subjective assessment, there is evidence that numerous employees declined to

work with plaintiff, not because of his race, but because of his difficult personality.  Good technical

skills alone do not fully measure an employee's "qualifications" for a job.  Certainly, the ability to

work harmoniously with others and be part of a team are equally important job "qualifications."  See

Mira v. Monroe County School Bd., 687 F.Supp. 1538, 1549-50 (S.D.Fla. 1988); see also Verniero

v. Air Force Academy School District No. 20, 705 F.2d 388 (10th Cir. 1983) (noting that subjective

evaluations played a legitimate part in an employer's determination as to whether an employee has

the ability to get along with others); Robinson v. Dupont Co., 33 Fair Empl. Prac. Cas. (BNA) 880

(D.C.Del. 1979); McCollum v. Bolger, 794 F.2d 602 (11th Cir.1986), cert denied, 479 U.S 1034,

107 S.Ct. 883, 93 L.Ed.2d 836 (1987) (plaintiff's suspension was found not to be on account of sex

discrimination but rather because of her inability to get along with her superiors and because of her

adversarial personality); Judge v. Marsh, 649 F.Supp. 770 (D.C. D.C.1986) (plaintiff's failure to be

eligible for promotion was not due to sex but was attributable to defendant's reliance on staff

complaints about plaintiff's abrasiveness, difficult nature, and manner in which she performed her

job, despite evidence of her personal and professional skills).  The undisputed evidence here shows

that, at the time of his termination, Correa lacked these skills.  For this reason, the plaintiff has failed

to offer any evidence to support this element of his *prima facie* case, that is, that he remained

"qualified" for it.

 A final element of the plaintiff's *prima facie* showing is to establish that a "nearly identical"

comparator was treated more favorably than he was treated.  Burke-Fowler v. Orange County, Fla.,

16

447 F.3d 1319, 1323 (11th Cir. 2006); <u>Maniccia v. Brown</u>, 171 F.3d 1364, 1368 (11th Cir. 1999);

<u>Ivey v. Paulson</u>, ___ F.3d ___, 2007 WL 216284 (11th Cir. 2007).  This requires the plaintiff to show

that, for misconduct essentially similar to his, a non-protected employee was not suspended or

terminated, as happened to plaintiff.  Plaintiff admits that he can point to no such comparator.  While

other employees were occasionally disciplined for unsafe work practices, no other employee had

been accused of frequently and repeatedly accelerating his truck while a co-worker passenger was

attempting to get into the truck, which is the accusation leading to his suspension.  Thereafter,

plaintiff was required to meet with and cooperate with a professional counselor charged with

evaluating whether it would be safe to allow plaintiff to return to work.  Once, again, the undisputed

evidence shows that plaintiff was reluctant to cooperate and, indeed, gave intentionally false answers

on an MMPI test administered by Dr. Clark, resulting in the invalidation of the test and plaintiff's

termination.  Although true that no other employees had been required before plaintiff to meet with

Dr. Clark, this only serves to highlight the absence of comparators necessary to a circumstantial-

evidence *prima facie* case.  Lacking a "nearly identical" comparator, plaintiff is unable to establish

a *prima facie* showing that either his suspension or his termination was racially motivated.

The court concludes, therefore, that plaintiff has failed to establish a *prima facie* showing that

either his suspension or his dismissal was the product of racial discrimination.  Assuming, however,

that plaintiff did meet all of the elements of his *prima facie* case of race discrimination, his claims

still are due to be dismissed because he has failed to demonstrate that the reasons given for his

disciplinary actions were pretextual.

### B.  Pretext

The presumption of discrimination that is raised by the *prima facie* showing may be rebutted if the employer offers a legitimate, nondiscriminatory reason for the employment action.  Once the nondiscriminatory reason is articulated, the burden shifts to the plaintiff to show that the reason is either not worthy of belief, or that, in light of all the evidence, a discriminatory reason more likely motivated the decision than the proffered reason.  Standard v. A.B.E.L. Servs. Inc., 161 F.3d 1318, 1331-33 (11th Cir. 1998) reh'g and reh'g *en banc* denied, 172 F.2d 884 (11th Cir. 1999), citing Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997), cert. denied, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998).  He must show not only that the articulated reason is false, but also that the true reason for not promoting him was discriminatory.  See Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1228 (11th Cir. 1993).  It is not the duty of this court to evaluate whether the decision to discipline plaintiff was fair or wise; employers are free to make unfair or unwise employment decisions so long as they do not violate anti-discrimination statutes.  See Elrod v. Sears, Roebuck and Co., 939 F.2d 1466, 1470 (11th Cir. 1991).

The defendant argues that plaintiff's claims are due to be denied for the additional reason that the defendant has offered a legitimate, non-discriminatory reason for its decisions to suspend and terminate Correa, and that Correa has failed to show that the reasons given are pretextual.  The defendant  has offered as a non-discriminatory reason for the suspension that plaintiff had practiced unsafe work habits and had failed to work successfully with co-workers.  The reason given for his subsequent firing was that the plaintiff had refused to cooperate with Dr. Clark after being directly told that he must do so.  In response to these articulated reasons, plaintiff argues that the complaints

against him were based on false statements.  He denies that he ever engaged in any conduct that could have given rise to the complaints.  However, he does not seriously dispute that Jones, who made the decision to suspend and fire Correa, had an honest belief that Correa had engaged in unsafe workplace behavior, had refused to attempt to get along with co-workers, and had been insubordinate by refusing to cooperate with Clark.  There is no evidence that Jones ever said or did anything that evidences an animus toward Hispanic employees.  In sum, plaintiff asserts that he was an "excellent" employee in every area, while Jones believed that Correa had serious shortcomings in workplace safety and problems with interpersonal relationship skills.  The court's job is to consider whether the evidence "presents a sufficient disagreement to require submission to a jury."  Combs, 106 F.3d at 1526.

The court finds that plaintiff has offered no evidence that the explanations of the decisions that led to his suspension or firing were pretextual, or that the real reason was race-based.  Moreover, Correa doesn't allege that Jones was racially biased; his complaints about bigotry appear to target his co-workers, not any supervisors.  Jones evaluated statements from a large number of employees, who all testified that Correa had frequently driven his truck forward without waiting for his partner to get safely into the truck.  Although Correa denies that he did so, there is no evidence that Jones had any reason to believe Correa in the face of so many contrary statements.  Furthermore, Jones has testified that he understood Lloyd's reports about Clark's meeting with Correa, and Anderson's interpretation of the MMPI as invalid, to mean that Correa had failed to cooperate with Clark as he had clearly been instructed.  While it can certainly be argued, and may be true, that both Clark and Anderson did not mean to imply that Correa had failed to cooperate, that does not contradict Jones'

19

testimony as to the information he received signified to him.  In other words, plaintiff has failed to produce any evidence that shows Jones' stated reason was not the real reason, or that the real reason for the disciplinary actions was race-based.  In both instances, Jones was presented with substantial information indicating that plaintiff regularly engaged in unsafe work practices and that he had failed to cooperate with the evaluation by Dr. Clark, despite being explicitly warned that he must do so to retain his job.  Accordingly, the motion for summary judgment as to all of plaintiff's claims relating to race-based discrimination is due to be granted.

### C.  Retaliation

The plaintiff in a retaliation case under Title VII must show that there is some causal relation between his protected activity and the adverse employment action against him.  Sullivan v. National R.R. Passenger Corp., 170 F. 3d 1056, 1059 (11th Cir. 1999).  The causal link requirement is to be construed broadly, and the Eleventh Circuit Court of Appeals has stated that "a plaintiff need only show that the protected activity and the adverse action were not wholly unrelated." Brungart v. Bellsouth Telecommunications, Inc., 231 F.3d 791, 799 (11th Cir. 2000) (quoting Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1354 (11th Cir. 1999).  However, to meet even this low threshold of proof of causation, the plaintiff must offer some evidence from which a jury could infer that the protected activity caused the adverse employment action.  It is this third element of the *prima facie* case for which plaintiff fails to meet his burden.

In the absence of direct evidence of a link between the protected activity and the adverse employment action, "[t]he general rule is that close temporal proximity between the employee's

protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection." Id. Plaintiff has no direct evidence of any connection between his voicing concerns about racism and his subsequent discipline. He must, then, present circumstantial evidence to show a causal link. For purposes of establishing a causal link between the protected conduct and the adverse action, and thus establishing a *prima facie* case of retaliation, plaintiff merely has to show a sufficient temporal proximity between the two. In this case, plaintiff argues that the time between his first complaint of discrimination and his suspension and termination was ten months. (Plaintiff's brief, p. 44). Plaintiff reports that he first complained about racism in June of 2004, and that he was put on paid leave in August 2004 pending investigation of the complaints made by Gregory. Plaintiff received an actual three-day disciplinary suspension in March 2005 and was terminated in April of 2005.

At the outset, the court doubts that plaintiff's making vague claims of racially discriminatory "attitudes" by co-workers during his June mid-year review with Shirley constitutes a protected activity for purposes of a retaliation claim. Plaintiff apparently made no specific accusation directly against any other employee, nor did he submit a formal complaint or seek to have the employer change any practice or investigate the "attitudes" complained of. The plaintiff did not truly "oppose" a practice made illegal under the statute. Thus, plaintiff failed to establish this element of a *prima facie* showing of retaliation.

But even assuming plaintiff has made an adequate *prima facie* showing, defendant has articulated legitimate, non-retaliatory reasons for putting plaintiff on paid leave and for both disciplinary actions taken. Plaintiff was placed on investigative leave with pay because of well-

supported accusations of frequent and repeated unsafe work practices.  His subsequent three-day suspension in March 2005 was for the same reason.  He was terminated after Jones concluded reasonably that plaintiff had failed to cooperate with Dr. Clark's assessment after being warned directly that he must cooperate.  For the reasons already discussed above, plaintiff has not shown that these reasons are mere pretext for retaliation.  Thus, even if the time period between plaintiff's complaints and the initial administrative leave with pay were deemed to be sufficiently short to give rise to a presumption of retaliation, the retaliation claim is subject to summary judgment in favor of the defendant for the same reason as the discrimination claim: the defendant has offered a legitimate, non-discriminatory reason for the discipline it imposed, and the plaintiff has completely failed to demonstrate that the reason is pretextual.

## IV. CONCLUSION

Accordingly, consistent with the foregoing discussion of the evidence presented and the law governing this action, this court determines that the Board's motion for summary judgment against Correa (court document #17) is due to be GRANTED, and Correa's claims are due to be DISMISSED WITH PREJUDICE.

A separate order will be entered in accordance with the findings set forth herein.

DATED the 30th day of April, 2007.

_____

T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE